UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CALIFORNIA PARENTS FOR THE
EQUALIZATION OF EDUCATIONAL
MATERIALS,

      Plaintiff,

    v.

KENNETH NOONAN, et al.,

      Defendants.

NO. CIV. S-06-532 FCD KJM

_____/

----oo0oo----

This matter is before the court on (1) plaintiff California
Parents for the Equalization of Educational Materials
("plaintiff" or "CAPEEM") motion for partial summary judgment as
to its Establishment Clause claim and (2) defendants'[1] motion for

---

[1] "Defendants" refers collectively to Kenneth Noonan,
Ruth Bloom, Alan Bersin, Yvonne Chan, Donald G. Fisher, Ruth E.
Green, Joe Nunez, Johnathan Williams and David Lopez, in their
official capacities as Members of the California State Board of
Education, and Tom Adams, in his official capacity as Director of
the Curriculum Frameworks and Instructional Resources Division
and Executive Director of the Curriculum Commission.

1

summary judgment, or alternatively, partial summary judgment as to plaintiff's second amended complaint, alleging claims for violation of the Equal Protection, Establishment and Free Speech and Association Clauses.[2]  Generally stated, in this action, plaintiff alleges the California State Board of Education ("SBE") discriminated against CAPEEM's members during the 2005-2006 history-social science textbook adoption process and that the adopted sixth-grade textbooks represent Hinduism in a discriminatory and denigrating manner.  During the adoption process, the SBE held public meetings, considered public comment and consulted with scholars to determine the appropriate content of its curriculum, including the appropriate portrayal of Hinduism in the context of world history and ancient civilization.  Plaintiff's critical objection is that the SBE did not adopt all of the textbook edits for which its members were advocating, and that ultimately, the adopted textbooks represent Hinduism in a discriminatory light.

By its motion, CAPEEM seeks partial summary judgment on its Establishment Clause claim, to the extent it is based on the subject textbooks' alleged indoctrination of students in their portrayals of Christianity and Judaism.[3]  More specifically,

_____

[2]   Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs.  E.D. Cal. L.R. 78-230(h).

[3]   Plaintiff also brings its Establishment Clause claim on an alternative theory:  CAPEEM alleges defendants violated the Establishment Clause when it adopted the instructional materials and final edits which are allegedly biased against Hinduism and treated other religions more favorably and accurately.  As set forth below, defendants move for summary judgment on this theory. Plaintiff does not cross-move for summary judgment on this issue. Instead, plaintiff's affirmative motion for partial summary judgment is limited to the theory of the alleged, unlawful

CAPEEM requests partial summary judgment on it Establishment
Clause claim based on (1) defendants' alleged expressed intent to
model portions of the subject history textbooks after the New
Testament; (2) the alleged improper influence of religious
figures in approving the material addressing Christianity and
religious considerations that went into evaluating the suggested
edits of the textbooks; (3) the adoption of textbooks that
allegedly treat biblical narratives as historical facts and
biblical events, including miracles, as actual events; and
(4) the adoption of teachers' materials which purportedly
emphasize aspects of indoctrination.

Defendants oppose the motion, first on standing grounds,
arguing CAPEEM lacks standing to bring an Establishment Clause
claim based upon the alleged unlawful indoctrination of students
into the Christian or Jewish religions because such a claim is
not germane to its organizational purpose, which is to promote an
accurate portrayal of the Hindu religion in California public
schools.  Alternatively, defendants contend plaintiff's
Establishment Clause claim based on this theory fails on the
merits, as an objective observer would conclude that the
textbooks at issue, when viewed in context, are teaching about
religion, rather than endorsing any particular religion.  Because
this court agrees that CAPEEM lacks standing to bring its
Establishment Clause claim based upon the alleged improper
indoctrination of students into the Christian or Jewish
religions, it does not reach the substantive merits of CAPEEM's

---

indoctrination of students into the Christian and Jewish
religions.

1  motion.[4]  CAPEEM's motion for partial summary judgment is DENIED

2  for lack of standing to bring the subject claim.

3       By their motion, defendants seek judgment in their favor as

4  to all of plaintiff's claims for relief.  Similar to their

5  opposition to plaintiff's motion, defendants argue, in the first

6  instance, that CAPEEM lacks standing to press any of its claims

7  to the extent they are based on alleged discrimination in the

8  textbook adoption process, and to the extent plaintiffs' claims

9  challenge the textbooks' contents, plaintiff only has standing to

10 allege violations of law based on the alleged negative treatment

11 of Hinduism.  Alternatively, defendants argue each of plaintiff's

12 claims fail on their merits as follows: (1) plaintiff's equal

13 protection challenge to the textbooks' contents fails under

14 controlling Ninth Circuit law, and its equal protection challenge

15 to the adoption process fails because plaintiff has no evidence

16 to support a finding of discriminatory intent by defendants,

17 CAPEEM cannot identify a similarly situated group and/or CAPEEM's

18 members were treated the same as other similarly situated

19 participants in the process; (2) plaintiff's Establishment Clause

20 claim fails because defendants' actions did not promote other

21 religions over Hinduism nor was the primary effect of defendants'

22 actions hostility towards Hinduism; and (3) plaintiff's Free

23 Speech and Association Clause claim fails because plaintiff

24 cannot show how defendants' actions chilled CAPEEM members' free

25 speech and association rights.

26

27

28     [4]    As such, with the exception of those facts pertaining
to the standing inquiry, the court does not recount herein the
facts which are only pertinent to CAPEEM's motion.

1    For the reasons set forth below, the court GRANTS

2 defendants' motion as to plaintiff's Establishment and Free

3 Speech and Association Clause claims.  As to plaintiff's equal

4 protection claim, the court GRANTS defendants' motion to the

5 extent plaintiff's claim is directed at the textbooks' contents,

6 as such a claim is not viable as a matter of law, but DENIES

7 defendants' motion to the extent it is directed at plaintiff's

8 process-related challenge.  As to that issue, triable issues of

9 fact exist as to whether CAPEEM's members were treated fairly in

10 the adoption process.

11                        **BACKGROUND**[5]

12    During the sixth grade world history and ancient

13 civilizations course, California students study the history and

14 impact of various religions, including Hinduism.  (Defs.' Stmt.

15 of Undisputed Facts in Supp. of MSJ, filed Dec. 30, 2008 [Docket

16 #158] [hereinafter, "DUF"], ¶ 2.)[6]  The SBE adopts textbooks and

17

18        [5]    Unless otherwise noted, the facts set forth below are
undisputed.  Where a dispute of facts exists, the court recounts
19 the facts in the light most favorable to plaintiff.  Both parties
filed various objections to each other's evidence.  In large
20 part, the court declines to rule on said objections as it does
not rely on the subject evidence in rendering its decision
21 herein.  However, to the extent it does rely on any objected-to
evidence, the party's relevant objection is overruled.  As to
22 plaintiff's separately filed motion to strike defendants' expert
Gonzalez-Reimann's expert report and rebuttal report (Docket
23 #189), the court DENIES the motion as moot.  The court does not
rely on said reports in rendering judgment in defendants' favor
24 in the respects set forth below.

25        [6]    Plaintiff filed a response to defendants' statement of
undisputed facts, setting forth only those facts to which it
26 claimed were disputed.  (CAPEEM's Stmt. of Disputed Facts re:
Defs.' MSJ, filed Jan. 13, 2009 [Docket #175] [hereinafter,
27 "RDF"].)  Thus, in all other respects, the court treats
defendants' stated facts as undisputed.  Where plaintiff has
28 raised material, admissible evidence to dispute a particular
fact, the court cites to either plaintiff's response to
defendants' statement of undisputed facts (the aforementioned

must balance the goals of a fair and accurate description of history with sensitivity to different cultural, ethnic and religious groups.  Cal. Const. Art. IX, § 7.5; Cal. Educ. Code §§ 60200-60206, 60040, 60044.  The State's curriculum requirements for textbook publishers are set forth in the <u>Criteria for Evaluating Instructional Materials in History-Social Science, Kindergarten through Grade Eight; The History-Social Science Content Standards</u> ("Content Standards") and the <u>History-Social Science Framework for California Public Schools, Kindergarten Through Grade Twelve</u> ("Framework").  (Adams Decl., filed Dec. 30, 2008 [Docket #160], at Ex. B.)  The Content Standards describe what students should know and be able to do by the end of each grade level.  (<u>Id.</u>)  These criteria are used to determine whether instructional materials submitted to the SBE should be adopted.  (<u>Id.</u>; Adams Decl., ¶ 6.)

As explained in the Framework, the kindergarten-grade 8 history-social science curriculum is designed with the idea that knowledge of history-social science disciplines is essential in preparing students for responsible citizenship and in comprehending global interrelationships.  (Defs.' Stmt. of Add'l Disputed Facts in Opp'n to Pl.'s MSJ, filed Jan. 13, 2009 [Docket #173] [hereinafter, "DDF"], ¶ 156.)  Studying major religious and

---

"RDF") or to plaintiff's separately filed statement of (purported) undisputed facts filed in opposition to defendants' motion (Defs.' Resp. to Pl.'s Stmt. of Undisp. Facts, filed Jan. 23, 2009 [Docket #201] [hereinafter, "PDF"].)  While plaintiff proffers these facts as <u>un</u>disputed, in most material respects the facts are disputed by defendants.  (<u>Id.</u>)  Ultimately, the court cites to either the "RDF" or "PDF" when denoting facts raised by plaintiff which create a triable issue of fact and thus provide a basis for the denial of defendants' motion in the respects set forth below.

philosophical traditions helps students to understand people's historical struggles with ethical issues and the current consequences, wars and political arrangements, like separation of church and state. (DDF ¶s 157, 158.) Students learn about religious beliefs and texts in order to better understand cultural continuity and conflict. (DDF ¶ 159.) The Framework includes guidelines for teaching about religion. (DDF ¶ 160.)

The study of religion is done within the larger context of human history. (DDF ¶s 156-168.) In grade six, students study the world history and geography of ancient civilizations, including the early societies of the near East and Africa, the ancient Hebrew civilization, Greece, Rome and the classical civilizations of India and China. (DDF ¶ 161.) Students receive an overview of these societies, including the geography of the region; trade; art; social, economic and political structures; and the everyday lives of the people. (DDF ¶ 162.) In this context, students study about the religions and religious texts of the different ancient civilizations. (DDF ¶s 163-168.) The Content Standards identify certain information which must be taught. (DDF ¶ 168.)

In January 2005, the SBE issued an invitation to publishers to submit instructional materials for new sixth grade history-social science textbooks. (DUF ¶ 1.) Eleven publishers submitted instructional materials for consideration. (Id.) Nearly a year earlier, beginning in February 2004, the SBE had solicited and selected 12 Content Review Panel ("CRP") and 62 Instructional Materials Advisory Panel ("IMAP") members to review the publishers' submissions. (DUF ¶s 3-4.) The CRP members are

subject matter experts who review the submitted instructional
materials for accuracy, scholarship and alignment with the
State's curriculum requirements (i.e., the Content Standards and
Framework).  (DUF ¶ 3.)  The IMAP members are generally K-12
teachers.  (Id.)

The CRP and IMAP received training in April 2005 and
convened for deliberations on July 11-14, 2005.  (DUF ¶ 5.)  They
then prepared a joint advisory report, which was mailed to the
Curriculum Commission (the "Commission") on September 14, 2005.
The report was made available to the pubic.  (Id.)  The
Commission is an advisory body that advises the SBE on the
adoption of curriculum frameworks and instructional materials.
The SBE considers the Commission's recommendations but is not
obligated to follow them.  (DUF ¶ 6.)

The Commission held public hearings on September 29-30,
2005, at which parties could submit comments orally or in
writing.  (DUF ¶ 8.)  The Commission received extensive public
comments that could not be addressed at the meeting and could not
be evaluated for accuracy at that time.  (Id.)  In particular,
the Commission received lengthy submissions from the Institute of
Curriculum Services ("ICS"), regarding the portrayal of Judaism
in the textbooks, the Council on Islamic Education ("CIE"),
regarding the portrayal of Islam in the textbooks, and the Hindu
Education Foundation ("HEF") and the Vedic Foundation ("VF"),
regarding the portrayal of Hinduism in the textbooks.  (DUF ¶
10.)  CAPEEM member, Karthik Venkataramani, combined certain
CAPEEM members' proposed textbook edits with HEF's and worked
with HEF throughout the process (these edits are referred to

8

1  herein as the "HEF/VF edits"). (DUF ¶ 11.)

2      In order to give full consideration to the public comments,

3  the Commission formed an Ad Hoc Committee to consider if the

4  recently received public comments should be included in the

5  Commission's final recommendation to the SBE. (DUF ¶ 9.)  The Ad

6  Hoc Committee held a publicly noticed meeting on October 31, 2005

7  and reviewed extensive written reports and comments from the

8  public and the CRP. (DUF ¶ 12.)  The California Department of

9  Education ("CDE") contracted with three former CRP members: Dr.

10 Williamson Evers, Dr. Naomi Janowitz and Dr. David Nystrom.

11 Additionally, CDE hired Dr. Shiva Bajpai, who HEF had

12 recommended, as a scholar to review the Hindu edits. (DUF ¶ 13;

13 RDF ¶ 1.)  Dr. Bajpai approved the edits proposed by HEF and VF

14 almost in their entirety. (DUF ¶ 14.)  At the October 31

15 meeting, Dr. Bajpai discussed the Aryan Invasion Theory ("AIT")

16 and argued that scholarship no longer supported the hypothesis.

17 (DUF ¶ 15.)  The State's Content Standards required publishers to

18 "discuss the significance of the Aryan invasion." (Id.)

19     Ultimately, the Ad Hoc Committee recommended edits to the

20 SBE, including those that Dr. Bajpai had endorsed. (DUF ¶ 16.)

21 All of the edits approved by the Commission and Ad Hoc Committee

22 were submitted to the SBE, along with all public comments. (DUF

23 Id.)  Prior to the SBE's textbook adoption meeting on November 9,

24 2005, it received correspondence from scholars and individuals

25 expressing concerns about the proposed edits offered by HEF/VF

26 that were recommended for adoption by the Ad Hoc Committee. (DUF

27 ¶ 17.)  These letters raised concerns about the accuracy of the

28 Ad Hoc Committee's recommended edits and about the objectivity

9

1   and scholarly accuracy of Dr. Bajpai's recommendations regarding

2   the HEF/VF edits.  (Id.; DUF ¶ 22.)

3        For example, Dr. Charles Munger, a member of the Commission,

4   sent a letter to the SBE on November 3, 2005, noting that AIT is

5   taught at college level courses at Stanford and the University of

6   California.  (Id.)  On November 7, 2005, Dr. Michael Witzel,

7   Professor of Sanskrit, Harvard University, sent a letter to the

8   SBE expressing concern about the HEF/VF edits.  (Id.)  In his

9   letter, Dr. Witzel expressed concern that the proposed changes to

10  early Indian history were politically motivated.  He attached one

11  of his scholarly publications regarding the political revision of

12  textbooks in India.  (Id.)

13       The next day, November 8, 2005, the SBE received a second

14  letter from Dr. Witzel signed by nearly 50 international

15  scholars, urging the SBE to reject the edits proposed by

16  "nationalist Hindu ('Hindutva') groups."[7]  (DUF ¶ 18.)

17       The agenda of the groups proposing these changes is
         familiar to all specialists in Indian history, who have
18       recently won a long battle to prevent exactly these kind
         of changes from finding a permanent place in history
19       textbooks in India.  The proposed revisions are not of a
         scholarly but of a religious-political nature . . .
20       These opinions do not reflect the views of the majority
         of specialists on ancient Indian history nor of
21       mainstream Hindus. . . . It would trigger an
         immediate international scandal if the California State
22       Board of Education were to unwittingly endorse religious-
         nationalistic views of Indian history from which India has
23       only extricated itself in the last two years.

24  (DUF ¶s 18-19.)  The letter also directed the SBE to two

25

26       [7]     The State Department defines Hindutva as "the
    politicized inculcation of Hindu religious and cultural norms to
27  the exclusion of other religious norms.  Hindutva, often
    synonymous with 'cultural nationalism,' excludes other religious
28  beliefs and fosters religious intolerance."  (Defs.' RJN, filed
    Dec. 30, 2008 [Docket #159], Ex. D, 2003 Report at 1.)

                                    10

U.S. State Department reports that discussed textbook revisions in India when the government was controlled by the Bharatiya Janata Party, a Hindu nationalist party.  (DUF ¶ 19.)  Therein, the State Department warned that the textbook revisions in India reflected Hindutva beliefs and "Hindu extremist interpretations of history."  (Id.)

Dr. Witzel's letter was signed by several renowned scholars, including Romila Thapar, the first Kluge Fellow at the U.S. Library of Congress.  (DUF ¶ 20.)  Dr. Thapar also sent an email to Tom Adams, Executive Director of the Commission, and Sue Stickel, Deputy Superintendent of Curriculum and Instruction, on November 7, 2005, stating that historians in India urged the SBE to consult with scholars before agreeing to make the changes to Hinduism.  (DUF ¶ 20.)  She and eight other Indian scholars sent a similar message on November 28, 2005.  (Id.)  Dr. Adams contacted Dr. Thapar and asked her to review the HEF/VF edits approved by Dr. Bajpai.  (DUF ¶ 21.)  She performed a cursory review of the edits and recommended that they should not be adopted for inclusion in the textbooks.  She also recommended that the CDE seek assistance from other "serious south Asian scholars" as in her opinion, Dr. Bajpai was regarded "as a rather indifferent scholar" with minimal research background.  (Id.)

Plaintiff asserts that the correspondence from Witzel and others supporting his views contained no evidence to support their allegations that Dr. Bajpai and those supporting the HEF/VF edits had a political agenda.  Plaintiff contends the letters contained no scholarly argument or mention of any specific edits or portions of the subject textbooks.  In some

11

respects, plaintiff states the letters were signed by scholars who had authored books for publishers submitting textbooks for evaluation by defendants. (PDF ¶s 121, 133; Green Decl., filed Dec. 30, 2008 [Docket #161], Exs. B and C.)

On November 9, 2005, at a public meeting, the SBE adopted and approved nine of the eleven sixth grade history-social science textbooks that had applied for adoption for use in California public schools. (DUF ¶ 23.) With respect to the remaining textbooks, the SBE directed the Commission to review the proposed edits and (1) accept only those edits and corrections that improve factual accuracy; (2) accept those edits and corrections that did not contradict the edits approved on September 30, 2005 and (3) accept no additional edits and corrections. (DUF ¶ 24.)

Thereafter, the CDE staff contracted the following three additional experts, who they believed were experts in ancient India: Dr. Stanley Wolpert, of the University of California, Los Angeles, Dr. James Heitzman of the University of California, Davis, and Dr. Witzel. (DUF ¶ 25.) Plaintiff disputes that Drs. Wolpert and Witzel are experts in ancient India. (RDF ¶ 3.) Plaintiff also contends defendants did not require these panelists to meet the standards defendants normally impose on content experts. For example, defendants did not require these panelists to submit their resumes, they were not vetted by defendants in any way and they were not screened by defendants with respect to the panelists' relationships to any publishers submitting textbooks in the process. (PDF ¶s 44-46, 53.) Plaintiff points out that while Dr. Bajpai had been screened with

respect to his relationship to publishers involved in the process
and defendants restricted his communications with publishers, Dr.
Wolpert was not similarly screened or precluded from contact with
publishers.  (PDF ¶ 53, 55, 56.)  At the time of his
participation in the process, Dr. Wolpert was a paid consultant
for one of the publishers that submitted a textbook for adoption
by defendants.  (PDF ¶ 57.)

Additionally, plaintiff asserts that various Hindu groups
brought to defendants' attention certain derogatory remarks Dr.
Witzel had made about Hindus, Hinduism and Indians, but
defendants took no action and continued to involve Witzel in the
process.  (PDF ¶s 102, 103, 107, 108.)  Finally, plaintiff
maintains that a November 22, 2005 document created by Drs.
Witzel, Wolpert and Heitzman evidence their disdain for
scholarship and hostility towards Hindus.  For example, in that
document, in response to a request to correct the dates of
authorship of two Hindu epics, the experts wrote, "Who in Sixth
Grade cares which epic was 'written' first?"  (PDF ¶ 114.)  In
that same document, when Hindus requested removal of a picture of
an alleged untouchable coming out of a garbage dump in which a
pig is scavenging, the three experts wanted to modify the image
to read "leaving us with a powerful picture of the scavenging
lifestyle associated with untouchability."  (PDF ¶ 116.)

Drs. Witzel, Wolpert and Heitzman reviewed the edits
submitted by HEF and VF and provided their recommendations to the
Commission.  (DUF ¶ 25.)  Based on a report from these three
reviewers, the CDE staff prepared a document to help the
Commission understand the issues of historical accuracy and

13

decide what edits reflected a scholarly consensus.  (DUF ¶ 26.)

On December 2, 2005, the Commission reviewed the proposed edits and the experts' input and made its own recommendations to the SBE.  (DUF ¶ 27.)  The Commission modified a number of edits, either keeping the original language of the textbooks or approving new language in many instances in direct conflict with the recommendations provided by Drs. Witzel, Wolpert and Heitzman.  CDE staff calculated that 97 of the 153 Commission recommended edits were directly contrary to the recommendations provided by Drs. Witzel, Wolpert and Heitzman.  (Id.)  Shortly thereafter, the SBE received a letter, dated December 7, 2005, signed by an additional 130 scholars protesting the Commission's decision to reject the scholarly recommendations of Drs. Witzel, Wolpert and Heitzman.  (DUF ¶ 30.)  The letter expressed concern "that a small, but highly organized group of people who claim to speak for all 'Hindus,' seem to have dominated" the proceedings, while a range of other organizations that represent Hindus were marginalized in the process.  (Id.)  The letter also expressed concern about the Commission's consultation with HEF and VF, "rather than trained academics on South Asia;" the scholars warned that HEF and VF were affiliated with the Hindutva extremist movement.  (Id.)  On the same day, Dr. Witzel wrote another letter on behalf of the 50 global experts who contacted the SBE on November 8, 2005, urging the SBE to reject the action of the Commission and instead adopt the Witzel, Wolpert and Heitzman edits, which were "carefully reviewed solely with a view towards historical accuracy."  (DUF ¶ 29.)

14

1    Upon learning of the actions taken by the Commission on
2    December 2, SBE President Ruth Green sent a letter to the
3    Commissioners expressing her concern that the Commission may not
4    have followed the November 9, 2005 SBE directives for its
5    meeting.  (DUF ¶ 31.)  Green called a closed-door meeting on
6    January 6, 2006 to discuss the textbook edits concerning Judaism,
7    Islam, Christianity and Hinduism.  (Id.)  CDE staff, SBE and
8    Commission members, and five content scholars, Dr. Naomi Janowitz
9    (Judaism), Shabbir Mansuri (Islam), Dr. David Nystrom (Ancient
10   History and Christianity), Dr. Witzel (Indian History and
11   Sanskrit) and Dr. Bajpai (Indian History), participated.  (DUF ¶
12   32.)  Plaintiff disputes the qualifications of some of the
13   content scholars, including Witzel and Mansuir (who plaintiff
14   states was simply a consultant for Houghton Mifflin's book), and
15   complains that members of HEF/VF were not invited to this
16   meeting.  (PDF ¶ 95.)  At the January 6 meeting, all of the Ad
17   Hoc Committee edits and corrections were discussed, including the
18   Hindu edits, which Drs. Bajpai and Witzel reviewed and debated.
19   (DUF ¶ 33.)  Plaintiff emphasizes that with respect to Judaism
20   and Christianity, the meeting addressed only a few minor changes.
21   In contrast, at least 83 new suggestions were made regarding the
22   edits on Hinduism.  (PDF ¶ 89.)  Ultimately, Drs. Bajpai and
23   Witzel agreed on many of the edits, with the exception of a few
24   subject areas, which reflect the content issues raised in this
25   litigation.  (DUF ¶ 33.)
26       Subsequent to the meeting, an SBE committee worked with CDE
27   staff to review all of the edits and corrections that the SBE
28   committee deemed appropriate.  (DUF ¶ 34.)  CDE and SBE staff

created a new set of recommendations that reflected the scholarly perspectives, public comment and SBE concerns (the "February 27 Edits and Corrections List"). (<u>Id.</u>)  Four members of the SBE committee met on February 27, 2006 at a public meeting.  The February 27 Edits and Corrections List was posted on the CDE website prior to the meeting. (DUF ¶ 35.)  Written comments received by the public regarding the posted list were forwarded to committee members prior to the meeting. (<u>Id.</u>)  Approximately 104 people gave public testimony at the hearing, including CAPEEM members. (DUF ¶ 36.)  Defendants maintain that those that spoke for and against the HEF/VF edits spoke for approximately equal amounts of time. (<u>Id.</u>)  The SBE designated two hours for public comment, and there were additional people who would have spoken had time allowed. (<u>Id.</u>)  After the two-hour public comment period, the SBE recommended approval of the edits, consistent with the SBE/CDE staff recommendations. (DUF ¶ 37.)

Plaintiff contends these new recommendations were not based on scholarly perspectives and many of the recommendations showed disdain for Hindus. (RDF ¶ 6.)  At the February 27 meeting, plaintiff maintains that only the Hindu participants were required to identify themselves as either "for" or "against" the HEF/VF edits and this permitted President Green to manipulate the time allowed to those speaking against the edits. (RDF ¶s 7-8.)

On February 27, 2006, the SBE committee recommendations were sent to the SBE for the regularly scheduled SBE March meeting. On March 8, 2006, the SBE held a public meeting; approximately 49 people addressed the SBE regarding the textbooks and proposed edits.  After approximately two hours of public comment, the SBE

1  adopted the SBE/CDE staff recommended edits to the sixth grade

2  history-social science textbooks.  (DUF ¶ 38.)

3       Plaintiff emphasizes that in rendering its final decision,

4  the SBE ignored many of the recommendations of the Commission.

5  Most glaringly, the Commission had recommended rejecting the

6  Oxford University Press ("OUP") textbook by a 14-0 vote.  (PDF ¶

7  20.)  CAPEEM member, Karthik Venkataramani, along with some HEF

8  members, had met with OUP representatives, and OUP had agreed to

9  make changes to improve the presentation of Hinduism.  (PDF ¶

10 23.)  OUP representatives had agreed with HEF's suggestions,

11 noting that the OUP author "was very amenable to the changes and

12 saw merit in [HEF's] comments."  (PDF ¶ 192.)  Yet, ultimately,

13 plaintiff asserts many of the more egregious portions of the OUP

14 and other texts were not changed.[8]  In contrast, the ICS worked

15 with OUP to make changes to the chapter on Judaism which were

16 accepted by the SBE.  (PDF ¶ 22.)

17

18      [8]   For example, plaintiff states one textbook describes
   the Hindu religious texts, the Vedas, as a "collection of poems,
19 myths, hymns and rituals."  (Defs.' Resp. to Pl.'s Stmt. of
   Undisputed Facts in Supp. of MSJ, filed Jan. 13, 2009 [Docket
20 #173] [hereinafter, "PUF"], ¶ 150.)  Similarly, unlike the case
   of Christianity and Judaism where the origin of the religion is
21 presented through the lens of believers and the lens of the
   relevant religious texts, plaintiff asserts the origin of
22 Hinduism is not attributed to Hindu beliefs.  Instead, plaintiff
   points out that the Holt textbook's chapter states that Hinduism
23 was developed by people called Aryans and then gives a
   description of an oppressive caste system.  The chapter ends with
24 a description of Jainism and mentions how there were people
   "unsatisfied" with Hinduism.  (PUF ¶s 151-152.)  Plaintiff
25 alleges the chapter on Buddhism also begins by taking a dim view
   and mentions how a young man was "dissatisfied with the teachings
26 of Hinduism."  (PUF ¶ 154.)  Finally, plaintiff describes that
   the Holt textbook's chapter on Hinduism does not present any
27 Hindu texts as historical documents.  Yet that same textbook
   refers to the Torah as a Jewish "account" of the early history of
28 the world, and the Gospels as the "accounts" of Jesus' life and
   teachings.  (PUF ¶ 125.)

1    Defendants maintain, on the other hand, that throughout the
2    textbook adoption process, the SBE received extensive public
3    comment from those both supporting and opposing the HEF/VF edits.
4    (DUF ¶s 39-40.)  Defendants claim members of CAPEEM participated
5    throughout the process, advocating for the HEF/VF edits in both
6    written comments and also by participating in the public
7    meetings.  (DUF ¶ 39.)  Ultimately, defendants assert the SBE
8    considered all perspectives equally and rendered its final
9    decision about the HEF/VF edits based on scholarly consensus.
10   (DUF ¶ 45.)
11       However, plaintiff contends, contrary to defendants, that
12   the Hindu groups supporting the HEF/VF edits were subjected to
13   different procedures during the process, including:
14   (1) defendants rejected suggestions from VF that were not in the
15   correct format, and CDE included only those VF comments that
16   consisted of "specific edits and corrections" (PDF ¶ 6); on the
17   other hand, the CIE, an Islamic advocacy group that participated
18   in the process, did not provide specific edits and corrections,
19   yet defendants came up with suggestions based on the "narrative
20   evaluation" submitted by CIE (PDF ¶ 7); (2) defendants imposed
21   arbitrary deadlines on Hindus supporting the HEF/VF edits,
22   including the improper rejection of a CAPEEM member's submissions
23   as untimely (PDF ¶ 18), and imposing special deadlines on their
24   groups with respect to submissions to the Ad Hoc Committee (PDF ¶
25   19); to the contrary, opponents of the HEF/VF edits, like Dr.
26   Witzel, faced no similar deadlines; (3) during various public
27   meetings, defendants asked Hindus to identify themselves as being
28   either "for" the HEF/VF edits or "against" them before being

18

permitted to speak (PDF ¶ 147).

Plaintiff also asserts that defendants treated Hindus supporting the HEF/VF edits differently when making decisions on content.  For example, when Jewish participants objected to treating Christianity as an improvement over Judaism, defendants approved changes to correct such claims.  (PDF ¶ 171.)  However, when Hindu participants asked for removal of the depiction of Buddhism as an improvement over Hinduism, their requests were denied.  (PDF ¶ 172.)  Additionally, plaintiff contends that while defendants conceded the request of Jewish participants to capitalize the letter "g" in "god," similar requests by Hindus resulted in changing all instances of the words "gods" and "goddesses" to the word "deities" with respect to the Hindu religion.  (PDF ¶ 176.)  Plaintiff also asserts that the request of Jewish participants to provide an insider perspective of their religion, such as by using the version of the Ten Commandments from the Hebrew Bible instead of the Christian Bible and removing references to the Christian Bible in the chapter on Judaism, were granted.  However, defendants did not grant requests by Hindus to provide an insider's perspective of their beliefs.  (PDF ¶s 177-179.)  Similarly, plaintiff points out that defendants granted the request of Jewish participants to remove references to the alleged belief of Jews having higher social status than the Samaritans, but did not grant the request of Hindu participants to remove the offensive sections of the textbooks attributing an oppressive caste system to Hinduism.  (PDF ¶s 180-181.)  Finally, plaintiff asserts defendants took action to ensure that Judaism was treated with sensitivity and asked the expert on Judaism to

work with the expert on Christianity, when a controversy arose about blaming Jews for the arrest of Jesus.  (PDF ¶ 166.) Plaintiff alleges similar sensitivity was not applied to Hinduism.  (<u>Id.</u>)

Shortly after the adoption of the edits, on March 9, 2006, CAPEEM formed for the purpose of promoting "an accurate portrayal of the Hindu religion in the public education system of the State of California."  (DUF ¶ 50.)  CAPEEM is comprised of Hindu and Indian parents who have children currently attending public schools in the first through sixth grades in California (and will use the material approved and adopted by the SBE) and who assert their own interests as well as the interests of their children. Certain of CAPEEM's individual member-parents participated, together with other Hindu groups, in the sixth-grade history-social science textbook adoption process.  (<u>See</u> Mem. & Order, filed Mar. 25, 2008 [Docket #108], at 6.)

CAPEEM filed the instant action on March 14, 2006, and filed the operative complaint, the second amended complaint, on August 25, 2006, alleging violations of the Equal Protection, Establishment and Free Speech and Association Clauses of the Constitution, pursuant to 42 U.S.C. § 1983.  By the action, plaintiff "challenges the derogatory and unequal treatment of the Hindu religion in social sciences textbooks used in the sixth grade in the California public education system."  (SAC ¶ 1.1.)[9]

---

[9]    At times on these motions, plaintiff asserts arguments challenging certain *seventh* grade textbooks.  Said textbooks are not at issue in the instant action as the complaint raises issues pertaining only to the adoption of certain sixth grade history-social science textbooks.  Fed. R. Civ. P. 8 (requiring that the complaint provide the defendant with a short and plain statement
(continued...)

More specifically, plaintiff challenges defendants' refusal to revise certain textbooks to remove allegedly offensive and derogatory references to the Hindu religion. "Plaintiff challenges the substance of the final edits as well as the (disparate) procedures followed by Defendants in adopting certain edits and rejecting others." (SAC ¶ 1.2.) Plaintiff seeks injunctive relief with respect to its claims prohibiting defendants from:

1. "treating Plaintiff or its members differently because of their religion, ethnicity, political beliefs, or national origin;"

2. "promoting other religions (and portraying other religions in a more favorable light) at the expense of the religious beliefs of plaintiff and its members;"

3. "denigrating the religious beliefs of Plaintiff and its members;"

4. "utilizing creationist, Judeo-Christian-based theories to explain the development of Hinduism and the migrations of ancient Hindus; and"

5. "taking adverse action against Plaintiff or its members based on their protected expression, political beliefs, or association[.]"

(SAC at 24:12-20.)[10]

---

[9](...continued)
of the claims against it). As such, the court has not considered plaintiff's arguments directed at any seventh grade textbooks.

[10]    On March 16, 2006, the Hindu American Foundation ("HAF") initiated a parallel action in state court seeking a writ of mandate. HAF alleged (1) procedural violations of California's APA, arguing the procedures through which defendants reviewed and approved the textbooks were not conducted under regulations formally promulgated under the State's APA, and California's Bagley-Keene Open Meeting Act, based on the SBE's failure to hold public meetings, and (2) content-based violations under California's Education Code, arguing the textbooks are not in compliance with the substantive, state legal standards applicable to their content. The court ultimately rejected HAF's
(continued...)

**STANDARD**[11]

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id.</u> at 324. Indeed, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Id.</u> at 322. In such a

---

[10](...continued)
content based claims but found that the textbook adoption process was flawed because the governing regulations had not been properly promulgated under the State's APA.  (DUF ¶ 49.)  As a result of the state court's decision, CDE promulgated new regulations for the textbook adoption process, which will be utilized in future textbook adoptions.  <u>Id.</u>

[11]    The court does not set forth the standard for cross-motions for summary judgment because as set forth above, while both parties move for summary judgment with respect to plaintiff's Establishment Clause claim, they move with respect to different theories of plaintiff's claim.

circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-289 (1968).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 251-52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 289.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial.'"
<u>Matsushita</u>, 475 U.S. at 587 (quoting Rule 56(e) advisory
committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines
the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any.  Rule
56(c); <u>SEC v. Seaboard Corp.</u>, 677 F.2d 1301, 1305-06 (9th Cir.
1982).  The evidence of the opposing party is to be believed, and
all reasonable inferences that may be drawn from the facts placed
before the court must be drawn in favor of the opposing party.
<u>Anderson</u>, 477 U.S. at 255.  Nevertheless, inferences are not
drawn out of the air, and it is the opposing party's obligation
to produce a factual predicate from which the inference may be
drawn.  <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224,
1244-45 (E.D. Cal. 1985).

Finally, to demonstrate a genuine issue, the opposing party
"must do more than simply show that there is some metaphysical
doubt as to the material facts. . . . Where the record taken as a
whole could not lead a rational trier of fact to find for the
nonmoving party, there is no 'genuine issue for trial.'"
<u>Matsushita</u>, 475 U.S. at 586-87.

**ANALYSIS**

**1.   <u>Plaintiff's Motion for Partial Summary Judgment</u>**

CAPEEM's motion for partial summary judgment challenges the
adopted textbooks' alleged indoctrination of students in their
portrayals of Christianity and Judaism.  Defendants oppose the
motion, in the first instance on standing grounds, arguing CAPEEM
lacks "organizational" standing to bring a claim challenging the

1  textbooks' portrayal of religions other than Hinduism.

2      On a motion for summary judgment, the plaintiff bears the

3  burden of establishing each element of standing.  Churchill

4  County v. Babbitt, 150 F.3d 1072, 1077 (9th Cir. 1998).

5  Establishing standing is an essential part of the case or

6  controversy requirement of Article III of the United States

7  Constitution.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560

8  (1992).  An organization may have standing to sue on behalf of

9  its members when: (1) its members would otherwise have standing

10 to sue in their own right; (2) the interests the association

11 seeks to protect are germane to its purpose; and (3) neither the

12 claim asserted nor the relief requested requires the

13 participation of the individual members in the lawsuit.  Hunt v.

14 Wash. State Apple Adver. Comm'n, 432 U.S. 333, 342-43 (1977).

15     Here, CAPEEM cannot challenge the textbooks' portrayal of

16 religions other than Hinduism because such a challenge is not

17 germane to its organizational purpose.[12]  According to CAPEEM's

18 Articles of Incorporation, its primary organizational purpose is:

19         to promote an accurate portrayal of the Hindu religion
           in the public education system of the State of California.
20

21 (DUF ¶ 50.)  CAPEEM has consistently maintained that its purpose

22 is to ensure the accurate representation of Hinduism in the

23 subject textbooks.  (Linton Decl. in Opp'n to Pl.'s MSJ, filed

24 Jan. 13, 2009 [Docket #170], Ex. B [CAPEEM Articles of Incorp.,

25

26     [12]     All three prongs of the Hunt test must be satisfied to
   find that an organization has standing to assert an action on
27 behalf of its members.  Because CAPEEM cannot establish the
   second requirement, the court need not consider the other
28 elements.  See Ranchers Cattlemen Action Legal Fund United
   Stockgrowers of Am. v. U.S. Dept. Of Ag., 415 F.3d 1078, 1103-04
   (9th Cir. 2005).

1   Bylaws and IRS description].)  Consistent with that purpose,

2   CAPEEM filed this lawsuit to challenge the "derogatory and

3   unequal treatment of the Hindu religion in social sciences

4   textbooks used in the sixth-grade in the California education

5   system."  (SAC ¶ 1.1.)  It has repeatedly represented that this

6   lawsuit is about challenging the portrayal of Hinduism in the

7   textbooks.  (Linton Decl., Ex. B [description of lawsuit from

8   CAPEEM's website, fund-raising fliers about lawsuit and

9   information sheet for fund-raisers].)  For example, CAPEEM's

10  website states:

11          The objective of this lawsuit is to correct the sixth
            grade social studies textbooks to end selective
12          discrimination against Hinduism in textbooks, protect
            the civil rights of Hindu children, ensure that Hindu
13          children are not alienated from their traditions
            because of negative portrayals of their religion,
14          removal colonial stereotypes regarding Hinduism,
            and present the positive aspects of Hinduism so
15          that Hindu children can be proud of their heritage.

16  (Linton Decl, Ex. B [CAPEEM00055].)

17          In <u>Ranchers Cattlemen Action Legal Fund United Stockgrowers</u>

18  <u>of Am. v. U.S. Dept. Of Ag.</u>, 415 F.3d 1078, 1103-04 (9th Cir.

19  2005), the Ninth Circuit dismissed an association's National

20  Environmental Protection Act ("NEPA") claims on standing grounds,

21  finding that the association's purpose of representing cattle

22  producers on issues of trade and marketing was not germane to its

23  NEPA claims.  The situation in this case is analogous.  In

24  contrast to its stated organizational purpose and the self-

25  identified purpose of this lawsuit, CAPEEM's motion focuses on

26  claims of Christian and Jewish indoctrination.  Such claims are

27  not germane to its stated purpose of promoting an accurate

28  portrayal of Hinduism in textbooks used in California public

schools.   As such, the court must find that plaintiff lacks
standing to adjudicate issues regarding the textbooks' portrayal
of religions other than Hinduism.   See also Pacific Northwest
Generating Co-Operative, 38 F.3d 1058, 1063 (9th Cir. 1994)
(finding that although the organizational plaintiff asserted
environmental injuries to it and its employees, it lacked
standing to bring environmental claims because its organizational
purpose was economic and not environmental); accord Consejo de
Desarrollo Economico de Mexicali, AC v. United States, 438 F.
Supp. 2d 1194, 1203 (D. Nev. 2006) (finding the plaintiff
organization lacked standing to press environmental claims as its
stated purpose was to promote the economic interests of its
members in Mexicali, Baja California, Mexico); Minnesota
Federation of Teachers v. Randall, 891 F.2d 1354, 1359 (8th Cir.
1989) (finding insufficient nexus existed between the purposes
and activities of the plaintiff teachers' union and the tax
issues raised in the complaint, and thus, the plaintiff failed to
satisfy the "germaneness" prong of the Hunt test).

     Plaintiff does not discuss the above case law in any respect
on the motion; indeed, plaintiff offers no authority whatsoever
in support of its bald assertion that it can satisfy the
germaneness requirement for this claim.   Instead, CAPEEM simply
proffers the testimony of its director and one member who
testified at their depositions in this case, that CAPEEM was
formed, in part, to prevent religious indoctrination.
(Balasubramani Supp. Decl., filed Jan. 23, 2009 [Docket #197],
Exs. A and B.)   Such self-serving statements made in support of
this legal action are insufficient to meet plaintiff's burden

27

under <u>Hunt</u>.   <u>See e.g.</u> <u>Animal Lovers Volunteer Assoc., Inc. v.</u>
<u>Weinberger</u>, 765 F.2d 937, 939 (9th Cir. 1985) (animal-lovers
association lacked standing to challenge Navy's shooting of feral
goats where it "has no history which antedates the legal action
it seeks to bring, and can point to no activities which
demonstrate its interest, other than pursuing a legal action"). 
Other than these self-serving statements, CAPEEM can point to no
organizational document (articles of incorporation or bylaws or
any amendments thereto), written policies of the organization,
meeting minutes or any other document which supports a finding
that CAPEEM's organizational purpose is to challenge the
textbooks' alleged indoctrination of religion, particularly the
Christian and Jewish religions as asserted in its motion.

     Moreover, that certain CAPEEM members have concerns, some of
which were raised during the textbook adoption process, that the
subject textbooks attempt to indoctrinate students into the
Christian and Jewish religions does not establish that CAPEEM's
*organizational* purpose is to prevent such indoctrination.  (<u>See</u>
Pl.'s Reply, filed Jan. 23, 2009 [Docket #198], at 1 [describing
a CAPEEM member's deposition testimony that he had concerns that
the contents of the textbooks and the Content Standards amounted
to indoctrination and pointing out that CAPEEM's director raised
his indoctrination concerns during the textbook adoption
process].)  Additionally, while CAPEEM did reference in its
complaint the textbooks' treatment of the Christian and Jewish
religions, it was done in order to substantiate CAPEEM's claims
of disparate treatment of the Hindu religion.  In other words,
the references to Christianity and Judaism were used as a

comparative tool to establish that the Hindu religion was treated

in a discriminatory manner.  As stated clearly at the outset of

plaintiff's complaint:

> This case challenges the derogatory and unequal treatment
> of the Hindu religion in social science textbooks used
> in the sixth grade in the California public education
> system.

(SAC ¶ 1.1.)  The treatment of other religions is relevant only

as it relates to establishing the unequal and discriminatory

treatment of Hinduism.  CAPEEM formed in order to bring this

lawsuit, designating its organizational purpose as the promotion

of "an accurate portrayal of the Hindu religion in the public

education system of the State of California."  (DUF ¶ 50.)  As

such, because CAPEEM's claim of alleged unlawful indoctrination

of students into the Christian and Jewish religions is not

germane to this organizational purpose, the court must find that

CAPEEM lacks standing to bring this claim.

Because the claim is not germane to its purpose, CAPEEM's

allegations regarding indoctrination by the textbooks represents

a mere "generalized grievance" that any citizen might attempt to

litigate simply because he or she takes offense at the textbooks.

Such generalized grievances "shared in substantially equal

measure by all or a large class of citizens" are insufficient to

establish standing.  See Warth v. Seldin, 422 U.S. 490, 498-500

(1975).  Plaintiff's motion for partial summary judgment is

therefore DENIED.

1        **2.   <u>Defendants' Motion for Summary Judgment</u>**

2          **a.   Standing**

3          In moving for summary judgment, as its threshold argument,

4    defendants contend plaintiff lacks standing to bring its claims

5    for relief to the extent they are based on (1) the textbook

6    adoption process and (2) the textbooks' contents in so far as the

7    books pertain to the portrayal of religions other than Hinduism.

8    Defendants concede that CAPEEM has standing to bring its claims

9    for relief to the extent they challenge the textbooks' portrayal

10   of Hinduism.  For the same reasons as set forth above, the court

11   agrees with defendants that CAPEEM lacks standing to bring its

12   Equal Protection, Establishment, and Free Speech and Association

13   Clause claims to the extent they are based on the textbooks'

14   portrayal of religions other than Hinduism, as such claims are

15   not germane to CAPEEM's organizational purpose.

16         Thus, the court considers here only whether CAPEEM has

17   standing to assert its claims for relief based on alleged

18   disparate treatment in the textbook adoption process.  Again, an

19   association has standing to bring suit on behalf of

20   its members when: (1) its members would otherwise have standing

21   to sue in their own right; (2) the interests the association

22   seeks to protect are germane to its purpose; and (3) neither the

23   claim asserted nor the relief requested requires the

24   participation of individual members in the lawsuit.  <u>Hunt v.</u>

25   <u>Washington State Apple Adver. Comm'n</u>, 432 U.S. 333, 343 (1977).

26   Under the first prong of the <u>Hunt</u> test, plaintiff must

27   allege facts supporting its members standing in their own right.

28   <u>Id.</u>  To allege individual standing, a plaintiff must state facts

30

demonstrating: (1) a concrete and particularized injury in fact that is actual or imminent; (2) a causal connection between the injury and the defendants' conduct or omissions; and (3) the likelihood that the injury will be redressed by a favorable decision.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. at 555, 560 (1992).  With regard to the adoption process, defendants argue CAPEEM cannot meet either the first or third requirement.

Defendants contend plaintiff cannot show an actual injury to any of its members nor can it demonstrate that its members were denied the opportunity to equally compete for a government benefit.  In <u>Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville</u>, 508 U.S. 656, 666 (1993), the United States Supreme Court recognized that a claim of discriminatory treatment, without any showing of actual injury, may be sufficient to establish standing when a defendant creates a barrier to a potential benefit.  In <u>City of Jacksonville</u>, the Court found a group of contractors had standing based on the alleged denial of equal footing in a government bidding process.  <u>Id.</u>  Defendants contend plaintiff has no evidence of direct injuries to its members, and thus, must rely on <u>City of Jacksonville</u> to establish standing.  But, defendants maintain in this case, the government did not erect any barriers to CAPEEM members' participation in the adoption process or deny CAPEEM members a benefit to which they were entitled, and thus, CAPEEM cannot establish standing under this latter theory.

Defendants are incorrect in both respects.  Plaintiff offers evidence of direct injury to at least one of its members.  CAPEEM asserts defendants did not afford one of its members an

31

opportunity to participate on an equal basis in the textbook
adoption process, and that conduct resulted in the humiliation of
the member.  (PDF ¶s 27.)  This member's testimony describing his
feelings of humiliation and alienation as a result of the alleged
disparate treatment he received in the adoption process is
sufficient to establish the injury-in-fact requirement of Lujan.
Moreover, even without this claim of direct injury to a member,
CAPEEM can establish an injury in fact under City of
Jacksonville.  Defendants' conduct during the adoption process
was governed by a body of laws, regulations and guidelines which
apply to the SBE's adoption of new textbooks.  Cal. Const. Art.
IX, § 7.5; Cal. Educ. Code §§ 60200-60206, 60040, 60044;(Adams
Decl., [Docket #160], at Ex. B [Framework and Content
Standards].)  That regulated process is akin to the government
bidding process in City of Jacksonville.  Plaintiff proffers
evidence that defendants applied the laws and rules governing the
process in an arbitrary manner toward those participants who
supported the HEF/VF edits; this disparate treatment, plaintiff
alleges, resulted in the adoption of materials that denigrate the
Hindu religion.  Thus, plaintiff can establish under City of
Jacksonville, that they were denied the opportunity of equal and
fair participation in the process, and they ultimately lost the
benefit of having their views heard and given equal consideration
in an open process.  For these reasons, the court finds that
plaintiff can establish the injury-in-fact requirement for
standing.

     As to the third requirement, defendants contend that because
the State has promulgated new regulations for the textbook

32

adoption process, which will be utilized in future textbook adoptions, plaintiff cannot show that its members' injuries will be redressed by a favorable decision in this case. Defendants' argument ignores the purpose of this litigation. CAPEEM's complaints are not directed at the governing rules themselves but how those rules are applied by defendants. CAPEEM seeks to ensure that in future adoption processes, the rules, whatever they may be, are *applied* in a fair and equal manner toward Hindus participating in the process. Thus, plaintiff requests injunctive relief in this case prohibiting, among other things, defendants from "treating [p]laintiff or its members differently [in the textbook adoption process] because of their religion, ethnicity, political beliefs, or national origin;" "denigrating the religious beliefs of [p]laintiff and its members;" and/or "taking adverse action against [p]laintiff or its members based on their protected expression, political beliefs, or association." (SAC at 24:12-20.) Such injunctive relief would redress plaintiff's claimed injuries in this case, and thus, the court finds that the third requirement for individual standing is met.[13]

---

[13] Though not fully developed in their papers, defendants appear to argue as an additional basis for finding a lack of standing, that plaintiff cannot demonstrate a likelihood of future harm. Defendants are correct that even when seeking prospective relief, a plaintiff must still satisfy the "imminence" requirement for Article III standing and demonstrate that its injury is currently impending. <u>Scott v. Pasadena Unified Sch. Dist.</u>, 306 F.3d 646, 658 (9th Cir. 2002). It is insufficient for a plaintiff to demonstrate a past injury. However, to meet the third requirement for individual standing, a plaintiff need only show a significant *possibility* of future harm to establish that its injury may be redressed by a favorable decision. <u>Steel Co. v. Citizens for a Better Envirn.</u>, 523 U.S. 83, 109 (1998). Construing the evidence proffered by plaintiff
(continued...)

1    Accordingly, defendants' motion on standing grounds is
2    DENIED.[14]

3              b.    **Equal Protection Clause Claim**[15]

4         CAPEEM alleges defendants violated the Equal Protection
5    Clause by discriminating against its members on the basis of
6    their religion, political affiliation, ethnicity and national
7    origin.  (SAC ¶s 5.3-5.4.)  The Equal Protection Clause of the
8    Fourteenth Amendment provides that no State shall "deny to any
9    person within its jurisdiction the equal protection of the laws."
10   U.S. Const. Amdt. 14, § 1.  This is "essentially a direction that
11   all similarly situated persons should be treated alike.  <u>City of</u>
12   <u>Cleburne v. Cleburne Living Ctr.</u>, 437 U.S. 432, 439 (1985).  The
13   guarantee of equal protection is not a source of substantive
14   rights or liberties, but rather "a right to be free from
15   discrimination in statutory classifications and other
16   governmental activity."  <u>Williams v. Vidmar</u>, 367 F. Supp. 2d

17

18        [13](...continued)
     in the light most favorable to CAPEEM, plaintiff has shown that
19   based on defendants' extensive and egregious, past conduct toward
     the Hindu participants supporting the HEF/VF edits, unless
20   enjoined herein, said conduct is substantially likely to recur.

21        [14]  Defendants did not argue that plaintiff could not
     establish the other two elements of the <u>Hunt</u> test, with respect
22   to plaintiff's challenges to the adoption process involving
     issues pertaining to Hinduism, and therefore, the court does not
23   discuss the elements of germaneness and necessity of individual
     participation.

24
          [15]  All of plaintiff's constitutional claims are brought
25   pursuant to 42 U.S.C. § 1983.  Section 1983 provides in part that
     "[e]very person who, under color of any statute, ordinance,
26   regulation, custom, or usage, of any State . . . subjects, or
     causes to be subjected, any citizen . . . to the deprivation of
27   any rights, privileges, or immunities secured by the Constitution
     and laws, shall be liable to the party injured . . . ."  Section
28   1983 confers no substantive rights itself, but rather, "provides
     remedies for deprivations of rights established elsewhere."  <u>City</u>
     <u>of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 816 (1985).

1265, 1270 (N.D. Cal. 2005). "[D]iscrimination cannot exist in a vacuum; it can only be found in the unequal treatment of people in similar circumstances." Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th Cir. 1995). Thus, to prove an equal protection violation, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class. Thornton v. City of St. Helens, 425 F.3d 1158, 1166-67 (9th Cir. 2005).

Here, defendants argue (1) CAPEEM cannot challenge the textbooks' contents under the Equal Protection Clause, and (2) CAPEEM cannot produce evidence, sufficient to withstand summary judgment, demonstrating defendants intended to discriminate against CAPEEM's members during the adoption process. With respect to defendants' first argument, plaintiff alleges that the adopted textbooks' content violates the Equal Protection Clause. (SAC ¶s 5.6, 5.8, 5.10, 5.12; Linton Decl. in Supp. of Defs.' MSJ, filed Dec. 30, 2008 [Docket #162], Ex. C [Interrog. Resps. 8, 12, 16].)[16] This claim must fail, however, because the State has the discretion to determine the content of its curriculum, and the Equal Protection Clause does not provide a basis to challenge such curriculum decisions. Montiero v.

_____

[16]    In opposing defendants' motion, plaintiff appears to concede this claim is not viable under Montiero, described below. (Pl.'s Opp'n to Defs.' MSJ, filed Jan. 14, 2009 [Docket #193-2], at 15-16.) Plaintiff argues only that Montiero does not foreclose its equal protection claim directed at improprieties in the textbook adoption process. Defendants do not contend Montiero precludes plaintiff's process-related equal protection claim. Because plaintiff clearly alleged its equal protection claim, in part, on the basis of the textbooks' contents, as stated in its second amended complaint and in discovery responses, the court briefly addresses whether such a claim is viable herein.

1   Temple Union High Sch. Dist., 158 F.3d 1022, 1032 (9th Cir.

2   1998); see also Downs v. L.A. Unified Sch. Dist., 228 F.3d 1003,

3   1013 (9th Cir. 2000) (finding no equal protection violation

4   because the plaintiff could not dictate contents of school's

5   speech).

6       In Montiero, a parent brought an equal protection challenge

7   to her child's high school curriculum based on race.  The

8   curriculum allegedly caused African-American students to suffer

9   psychological injuries and lost educational opportunities due to

10  required reading that contained "repeated use of the profane,

11  insulting and racially derogatory term 'nigger.'"  158 F.3d at

12  1024.  None of the required reading referred to Caucasians in a

13  derogatory manner.  Id.  The Ninth Circuit held that the Equal

14  Protection Clause will not support a challenge to the curriculum

15  even where its contents are allegedly discriminatory.  Id. at

16  1022.

17      Similarly, here, CAPEEM maintains that the textbooks are

18  discriminatory against Hindus and will result in psychological

19  harm and lost educational opportunities for Hindu students.

20  Montiero squarely forecloses an equal protection claim on this

21  basis.  Accordingly, to the extent plaintiff bases its equal

22  protection claim on a challenge to the textbooks' contents

23  themselves, defendants' motion for summary judgment is GRANTED.

24      Plaintiff also brings its equal protection claim on the

25  basis of alleged disparate treatment of CAPEEM members in the

26  textbook adoption process.  As to this process claim, defendants

27  assert plaintiff fails to produce sufficient evidence that

28  (1) defendants acted with discriminatory intent; (2) a similarly

situated group was treated more favorably; and (3) CAPEEM's members were treated differently in the process.  The court addresses each of these arguments in turn below:

### (1)  Discriminatory Intent

First, proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.  <u>City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.</u>, 538 U.S. 188, 194 (2003).  Discriminatory intent "implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group."  <u>Personnel Adm'r v. Feeney</u>, 442 U.S. 256, 279 (1979).  In this case, contrary to defendants' protestations that CAPEEM has "no evidence" of defendants' discriminatory intent, CAPEEM proffers sufficient evidence, in the form of certain direct statements evidencing hostility toward certain Hindu groups and procedural irregularities that impacted only the Hindu groups supporting the HEF/VF edits, to raise triable issues of fact that defendants intentionally discriminated against CAPEEM members in the adoption process.

For example, CAPEEM proffers evidence of certain procedural irregularities that only effected Hindu groups supporting the HEF/VF edits: (1) these Hindu groups' recommended edits were subject to formatting requirements which other religious groups' edits were not subjected (PDF ¶s 6-8); (2) the suggestions of these Hindu groups were subject to arbitrary deadlines which other religious groups were not subjected (PDF ¶ 17); (3) while certain controversies concerning the textbooks' contents involved religions other than Hinduism, defendants only brought in experts

opposed to the Hindu groups in order to evaluate the Hindu groups' suggested edits (PDF ¶s 13, 17, 47-48, 67, 70, 166, 184-186);[17] (4) defendants fully vetted Dr. Bajpai, who supported the HEF/VF edits, but they did not do the same for the experts they hired who opposed the edits, and defendants imposed special requirements only on Dr. Bajpai and not on the experts opposing the edits, which included disallowing Dr. Bajpai from having any connection to the advocacy groups supporting the HEF/VF edits and precluding him from having any relationship with publishers submitting textbooks in the process (PDF ¶s 44-46, 49, 51-56, 59, 60);[18] (5) various edits suggested by these Hindu groups which were similar to edits suggested by other religious groups were nonetheless treated differently, including (a) while the requests of Jewish groups to capitalize the "g" in "god" were granted the same request of the Hindu groups was not (PDF ¶s 175-176); (b) the request of Jewish participants to remove text related to a claimed higher social status of Jews with respect to Samaritans was removed but the alleged offensive text which blamed Hinduism for an oppressive caste system was not removed (PDF ¶s 180-181); (c) defendants removed claims of Christianity being an improvement over Judaism when Jewish participants complained but

---

[17] To contrary, plaintiff proffers evidence that the advisors for Christianity, Islam and Judaism, Nystrom, Mansuri and Janowitz, were not hostile to these religions.  (Id.)

[18] The experts opposing the HEF/VF edits were not put to the same requirements.  For example, plaintiff proffers evidence that Wolpert acted as a consultant to one of the publishers submitting a textbook in the process at the same time he served as a panelist on the Ad Hoc Committee.  Defendants conceded in this litigation that such a dual role presented a conflict of interest.  (See Defs.' Reply on MSJ, filed Jan. 23, 2009, at 6-7; PDF ¶s 61-62.)

defendants denied the Hindu groups' request to remove claims of
Buddhism being an improvement over Hinduism (PDF ¶s 172-174,
220); and (d) defendants granted the requests of Jewish
participants to provide an insider's perspective of their
religion, such as by using the version of the Ten Commandments
from the Hebrew Bible instead of the Christian Bible and removing
references to the Christian Bible in a chapter on Judaism, but
defendants denied the Hindu groups' similar requests to provide
an insider's perspective of their beliefs (PDF ¶s 177-178).

In addition to these procedural irregularities which CAPEEM
proffers as circumstantial evidence of defendants' discriminatory
intent toward the Hindu groups supporting the HEF/VF edits,
CAPEEM also provides evidence of certain statements, which when
viewed in the light most favorable to plaintiff, evidence
hostility toward the Hindu groups.  Said evidence includes the
following: (1) defendants were aware of Dr. Witzel's alleged
biases toward the Hindu groups as a result of statements Witzel
made to Tom Adams and as a result of information the Hindu groups
provided to defendants about Witzel's derogatory statements
toward the Hindu groups, yet defendants continued to consult
Witzel and involve him in the process (PDF ¶s 108, 112);[19] (2)
defendants accused "[HEF/VF] . .. [of] theological tweaking" (PDF
¶ 258); (3) Charles Munger, a member of the Commission, called
the HEF/VF edits "foolish" (PDF ¶ 100); and (4) Tom Adams called

---

[19]    Defendants' argument that they cannot be held liable
for the alleged biases of Dr. Witzel, a "third-party" to this
litigation, is unavailing.  Defendants hired Witzel as an advisor
in this process; any alleged biases he had, of which defendants
were aware are relevant to this case; specifically, whether
defendants intended to discriminate against plaintiff.

1  VF member Janeshwari Devi's comments a "nationalist

2  interpretation of Indian history," despite the fact that Devi is

3  from the United States, and Adams testified he did not think she

4  was of Indian descent (PDF ¶ 31).

5       These facts sufficiently raise a triable issue as to

6  defendants' intent in considering the positions of the Hindu

7  groups who supported the HEF/VF edits.  While defendants may well

8  contend that such evidence is insufficient for plaintiff to

9  *prevail* on its equal protection claim, that argument goes to the

10  weight of this evidence, which is ultimately an issue for the

11  trier of fact to consider.  (Defs.' Reply, filed Jan. 23, 2009

12  [Docket #200], at 5-9.)  At this juncture, the court must

13  construe the evidence proffered by plaintiff in the light most

14  favorable to plaintiff.  <u>Anderson v. Liberty Lobby, Inc</u>., 477

15  U.S. 242, 255 (1986) (holding that in resolving a summary

16  judgment motion, the evidence of the opposing party is to be

17  believed, and all reasonable inferences that may be drawn from

18  the facts placed before the court must be drawn in favor of the

19  opposing party).  In the end, to withstand summary judgment,

20  plaintiff must only raise sufficient facts to support a

21  reasonable trier of fact's verdict in its favor.  <u>Id.</u> at 251

22  ("Before the evidence is left to the jury, there is a preliminary

23  question for the judge, not whether there is literally no

24  evidence, but whether there is any upon which a jury could

25  properly proceed to find a verdict for the party producing it,

26  upon whom the onus of proof is imposed.")  <u>Id.</u> at 251 (citations

27  omitted).  Plaintiff has done so here.

28

**(2)  Similarly Situated Group**

Defendants also argue that CAPEEM's equal protection challenge to the adoption process must fail because it does not identify a similarly situated group of persons who allegedly received more favorable treatment.  According to defendants, it was only the various Hindu groups supporting the HEF/VF edits that "invoked [an] international response from scholars," warning the SBE that the groups' suggested edits were not accepted by mainstream practitioners and instead advanced a sectarian, religious-political agenda.  (Defs.' Mem. of P. & A. in Supp. of MSJ, filed Dec. 30, 2008 [Docket #157], at 17.)  While defendants are correct that discrimination, actionable under the Equal Protection Clause, may be found only in the unequal treatment of people in similar circumstances, defendants read this requirement too narrowly here.  See Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th Cir. 1995).  CAPEEM is not required to show that a similar group of persons' suggested edits faced the same international challenge as the Hindu groups' edits; rather, CAPEEM is required to show simply that the Hindu groups' suggested edits were akin to other groups participating in the adoption process but received disparate treatment.  As set forth above, CAPEEM has raised sufficient evidence on this issue to create a genuine issue for trial.  CAPEEM proffers evidence of certain procedural irregularities that applied only to its members as opposed to other groups, including other Christian and Jewish persons participating in the same adoption process in similar ways to CAPEEM's members.  Like the above, this evidence is sufficient to meet CAPEEM's burden on summary judgment.

41

### (3) Disparate Treatment from Other Similarly Situated Group

Finally, defendants argue that even if plaintiff can adequately identify a group of similarly situated persons, it cannot establish that it was treated less favorably than these other persons in the textbook adoption process. Defendants contend all participants in the process, including the Hindu groups supporting the HEF/VF edits, received an equal opportunity to participate in the process. Again, for the same reasons as set forth above, CAPEEM proffers sufficient evidence to raise a material issue of fact concerning whether its members received the same opportunity to participate in the process as other religious groups. Viewed in the light most favorable to plaintiff, the evidence shows that only the Hindu groups supporting the HEF/VF edits were subjected to certain, more strenuous procedures and standards. See Flores v. Pierce, 617 F.2d 1386, 1389 (9th Cir. 1980) (recognizing that the deviation from previous procedural patterns and the adoption of an ad hoc method of decision making without reference to fixed standards, among other things, were sufficient to raise an inference of discriminatory animus on an equal protection claim).

Accordingly, for all of the above reasons, defendants' motion for summary judgment as to plaintiff's equal protection claim challenging the textbook adoption process is DENIED.[20]

---

[20]   As their final argument directed at plaintiff's equal protection claim, defendants contend that even if plaintiff could make a showing that its members were treated differently than similarly situated groups, the SBE's actions toward plaintiff's members was done to avoid a violation of the Establishment Clause, and thus, defendants have a defense to liability under the Ninth Circuit's "Establishment Clause defense"-jurisprudence.
(continued...)

1          c.   **Establishment Clause Claim**

2        The Establishment Clause provides: "Congress shall

3  make no law respecting an establishment of religion . . . ."

4  U.S. Const. amend. I, cl. 1.  The prohibition of the

5  Establishment Clause applies to state governments through the

6  Fourteenth Amendment.  Everson v. Board of Education, 330 U.S. 1,

7  8 (1947).  The United States Supreme Court has held:

8          the Establishment Clause [has come] to mean that
         government may not promote or affiliate itself with any
9          religious doctrine or organization, may not discriminate
         among persons on the basis of their religious beliefs
10         and practices, may not delegate a governmental power to a
         religious institution, and may not involve itself too
11         deeply in such an institution's affairs.

12  County of Allegheny v. ACLU, 492 U.S. 573, 590-91 (1989)

13  (footnotes omitted).

14        As decreed by the Supreme Court, and followed in the Ninth

15  Circuit,[21] claims brought under the Establishment Clause are

16

17        [20](...continued)
  Hills v. Scottsdale Unified Sch. Dist., 329 F.3d 1044, 1053 (9th
18  Cir. 2003) (recognizing that Establishment Clause concerns can
  justify certain speech restrictions in order to avoid the
19  appearance of government sponsorship of religion.)  Thus, the
  Ninth Circuit has recognized in certain contexts a defense to an
20  equal protection claim, where a government defendant can show its
  actions were done to ensure compliance with the Establishment
21  Clause.  Here, defendants maintain the SBE's treatment of the
  HEF/VF edits was done to ensure that the edits were neutral,
22  accurate and did not endorse a particular religion.  However, the
  defense recognized in Hills only applies where the government
23  actor proves that the Establishment Clause would have been
  violated had the activity at issue been allowed to proceed.  Id.
24  at 1053; see also Nurre v. Whitehead, 520 F. Supp. 2d 1222, 1237
  n. 20 (W.D. Wash. 2007).  Defendants wholly fail to make this
25  showing here.  Defendants provide no analysis, let alone
  evidence, to demonstrate that the State's adoption of the HEF/VF
26  edits, themselves, would have violated the Establishment Clause.
  As such, the court summarily dismisses defendants' argument.

27
        [21]   See Brown v. Woodland Jt. Unif. Sch. Dist., 27 F.3d
28  1373, 1378 (9th Cir. 1994); Kreisner v. San Diego, 1 F.3d 775,
  780 (9th Cir. 1993).
                                      (continued...)

1   analyzed under the three-part "Lemon Test."  See Lemon v.

2   Kurtzman, 403 U.S. 602 (1971).  Under the Lemon analysis, a

3   statute or practice which touches upon religion must (1) have a

4   secular purpose; (2) must neither advance nor inhibit religion in

5   its principal or primary effect; and (3) must not foster an

6   excessive entanglement with religion.  County of Allegheny, 492

7   U.S. at 592; see Lemon, 403 U.S. at 612-13.

8        In its complaint, CAPEEM alleges that defendants violated

9   the Establishment Clause when it adopted the instructional

10  materials and final edits, which are allegedly biased against

11  Hinduism and treated other religions more favorably and

12  accurately.  (SAC ¶ 6.3-6.6, 6.9-6.10.)  In addition, CAPEEM

13  alleges defendants violated the Establishment Clause during the

14  adoption process by imposing "special hurdles" for the Hindu

15  groups and Hindu expert, Dr. Bajpai, and by using experts

16  allegedly biased against the Hindu groups supporting the HEF/VF

17  edits.  (SAC ¶ 6.7-6.8.)  Defendants move for summary judgment as

18  to both theories of plaintiff's claim.  However, in opposing

19  defendants' motion, plaintiff addresses only whether it can

20  establish an Establishment Clause violation based on the

21  textbooks' contents themselves.

22       Plaintiff does not separately argue, or provide evidence to

23  support, an Establishment Clause violation based on the textbook

24  adoption process.  (Pl.'s Opp'n to Defs.' MSJ at 22-33; Defs.'

25  Reply on MSJ at 12:17-18.)  Therefore, the court construes

26  plaintiff's failure to respond as a non-opposition to that

27

28       [21](...continued)

1  portion of defendants' motion.  E.D. Cal. L.R. 78-230(c).

2  Accordingly, the court addresses only whether plaintiff has

3  raised a triable issue of fact that the subject textbooks violate

4  the Establishment Clause.

5       Before applying the Lemon test, several preliminary issues

6  are worth noting.  As an initial matter, in assessing defendants'

7  motion, the court has considered that alleged violations of the

8  Establishment Clause in elementary school settings present

9  heightened concerns for courts.  The United States Supreme Court

10 has made this clear in its treatment of similar cases.  See e.g.,

11 Grand Rapids Sch. Dist. v. Ball, 473 U.S. 373, 390 (1985) (noting

12 that "[t]he symbolism of a union between church and state is most

13 likely to influence children of tender years, whose experience is

14 limited and whose beliefs consequently are the function of

15 environment as much as free and voluntary choice"); Lee v.

16 Weisman, 112 S.Ct. 2649, 2658 (1992) (recognizing the "subtle

17 coercive pressure in the elementary public schools"); Edwards v.

18 Aquillard, 482 U.S. 578, 584 (1987) (stating that the sources of

19 this coercive power are "mandatory attendance, . . . students'

20 emulation of teachers as role models, and the children's

21 susceptibility to peer pressure").  Therefore, this court

22 recognizes it must be "vigilant in monitoring compliance with the

23 Establishment Clause in elementary schools."  Edwards, 482 U.S.

24 at 583-84.

25      However, the court is also mindful that this heightened

26 concern is balanced to a great degree by the broad discretion of

27 a school board to select its public school curriculum.  Epperson

28 v. Arkansas, 393 U.S. 97, 104 (1968).  The Supreme Court has

emphasized, in such cases as this, that courts should inject themselves in a controversy regarding the daily operation of a school system only if basic constitutional values are "directly and sharply implicate[d]."  Id. at 104-05.  Thus, in Abington Sch. Dist. v. Schempp, 374 U.S. 203, 300 (1963) (Brennan, J., concurring), the Court recognized that teaching many social sciences requires mentioning religions, but decisions about how religion is used "are matters which the courts ought to entrust very largely to the experienced officials who superintend our Nation's public schools.  They are experts in such matters, and we are not."

In the context of this balance, courts have held a number of activities to be violations of the Establishment Clause, including: (1) inviting clergy to offer invocation and benediction prayers at formal graduation ceremonies for high schools and middle schools (Lee, 505 U.S. at 577); (2) daily readings from the Bible (Ablington Sch. Dist., 374 U.S. at 203); (3) daily recitation of the Lord's Prayer (id.); (4) distributing Gideon Bibles to fifth grade public school students (Berger v. Rensselaer Central Sch. Corp., 982 F.2d 1160, 1171 (7th Cir. 1993)); (5) posting the Ten Commandments in every classroom (Stone v. Graham, 449 U.S. 39 (1981)); (6) requiring the teaching of evolution science with creation science or not at all (Edwards, 482 U.S. at 578)); (7) beginning school assemblies with prayer (Collins v. Chandler Unified Sch. Dist., 644 F.2d 759 (9th Cir. 1991)); (8) teaching a Transcendental Mediation course that includes a ceremony involving offerings to a deity (Malnak v. Yogi, 592 F.2d 197 (3rd Cir. 1979)); (9) teaching of weekly

religious education classes by private religious educators in public elementary school classrooms (<u>Vaughn v. Reed</u>, 313 F. Supp. 431 (W.D. Va. 1970)); and (10) teaching of the Bible, for an express religious purpose, in public elementary and high schools by private religious educators (<u>Herdahl v. Pontotoc County Sch. Dist.</u>, 933 F. Supp. 582 (N.D. Miss. 1996)).[22]

Courts have not been inclined to find an Establishment Clause violation, however, with respect to the use of certain books, including novels, textbooks and reading series, in a public school curriculum. In other words, in cases like this, when teaching about religion is incorporated into a larger secular curriculum, courts have consistently found no Establishment Clause violation. <u>See e.g.</u> <u>Grove v. Mead Sch. Dist.</u>, 753 F.2d 1528 (9th Cir. 1985) (involving a novel, <u>The Learning Tree</u>, assigned in a tenth grade English class which allegedly advanced the religion of "secular humanism" while inhibiting the plaintiffs' Christian religion); <u>Brown v. Woodland Jt. Unified Sch. Dist.</u>, 27 F.3d 1373 (9th Cir. 1994) (involving the <u>Impressions</u> Reading Series which allegedly addressed religious rituals endorsing witchcraft); <u>Fleischfresser v. Dirs. of Sch. Dist. 200</u>, 15 F.3d 680 (7th Cir. 1994) (involving same reading series as <u>Brown</u>). Moreover, the Supreme Court has expressly recognized that even the Bible itself may be used in public schools to teach literary and historical lessons. <u>Abington Sch. Dist.</u>, 374 U.S. at 225.

---

[22]   In opposing defendants' motion, plaintiff relies primarily on <u>Vaughn</u> and <u>Herdahl</u>. However, for the reasons set forth below, these cases are easily distinguishable from this case.

1    Here, the State of California has determined that students
2 should study the importance of religion in the world history and
3 ancient civilization course to gain a better understanding of
4 different cultures and conflicts.  The SBE considered various
5 comments and recommendations regarding the proposed textbooks, it
6 held numerous meetings, both public and private regarding the
7 appropriate content for the adopted textbooks and it consulted
8 several experts in the various religions to determine whether the
9 proposed books were accurate and neutral.  After weighing all of
10 the above, it made the decision to approve certain edits and
11 adopt certain textbooks for use in the State's public schools.
12 CAPEEM objects to certain aspects of the textbooks' content.
13 However, mere disagreement with the contents of the textbooks
14 will not establish an Establishment Clause claim.  "If an
15 Establishment Clause violation arose each time a student believed
16 that a school practice either advanced or disapproved of a
17 religion, school curricula would be reduced to the lowest common
18 denominator, permitting each student to become a 'curriculum
19 review committee' unto himself or herself."  Brown, 27 F.3d at
20 1379.  In this case, for the reasons set forth below, CAPEEM
21 cannot satisfy the requisite elements of the Lemon test.  At
22 bottom, by this claim, CAPEEM seeks to act as a "curriculum
23 review committee;" however, such a role, as recognized by Brown,
24 is misplaced because SBE is the appropriate body to determine the
25 contents of the textbooks.

26              **(1)  Secular Purpose**

27    The secular purpose prong of the Lemon test asks whether the
28 government's actual purpose is to endorse or disapprove of

48

religion.  <u>Wallace v. Jaffree</u>, 472 U.S. 38, 56 (1985).
Government activity will fail the purpose prong of the test only
if it is motivated *wholly* by an impermissible purpose.  <u>Am.</u>
<u>Family Ass'n, Inc. v. City and County of San Francisco</u>, 277 F.3d
1114, 1121 (9th Cir. 2002) (recognizing that a reviewing court
"must be reluctant to attribute unconstitutional motives to
government actors in the face of a plausible secular purpose").
Here, the SBE's purpose in adopting the sixth grade history-
social science textbooks is patently secular.  It is fulfilling
its obligation to adopt instructional materials for California
students that are accurate and consistent with the State's
learning objectives.  Cal. Const. Art. IX, § 7.5; Cal. Educ. Code
§ 60200.  The SBE must ensure that adopted instructional
materials contain accurate and non-discriminatory portrayals of
other cultures, racial diversity, religions, and the
contributions of both men and women in all types of roles.  Cal.
Educ. Code § 60040, 60044, 60200.  Students learn about religions
for the secular purpose of understanding their impact on history.
(DDF ¶s 156-168.)  Thus, the secular purpose of the adopted
textbooks is to educate California's students about history.
<u>Accord</u> <u>Grove</u>, 753 F.2d at 1539 (Canby, concurring) (recognizing
that there was "no question that the book [there] was included
within the curriculum for the entirely non-religious (i.e.
secular) and commendable purpose of exposing students to
different cultural attitudes and outlooks").

    CAPEEM fails to offer any evidence to the contrary; indeed,
it does not expressly discuss the secular purpose prong in its
opposition.  Thus, the court finds that defendants have

1   demonstrated, conclusively in their favor, that the State's use
2   of the subject textbooks has a secular purpose.  The first
3   element of the <u>Lemon</u> test is therefore satisfied.
4                **(2)   Endorsement or Disapproval of Religion**
5        CAPEEM alleges that the textbooks have the primary effect of
6   advancing other religions and inhibiting the Hindu religion.
7   (SAC ¶s 6.3-6.6, 6.9-6.10.)  CAPEEM has the burden of proving
8   that defendants violated the second prong of the <u>Lemon</u> test,
9   which bars governmental actions that have the principal or
10  primary effect of advancing or disapproving religion.  <u>Vasquez v.</u>
11  <u>L.A. County</u>, 487 F.3d 1246, 1255-56 (9th Cir. 2007).  A
12  government practice has the effect of impermissibly advancing or
13  disapproving of religion if it is "sufficiently likely to be
14  perceived by adherents of the controlling denominations as an
15  endorsement and by the nonadherents as a disapproval of their
16  individual religious doctrines." <u>Sch. Dist. of Grand Rapids v.</u>
17  <u>Ball</u>, 473 U.S. 373, 390 (1985).  Thus, the relevant inquiry in
18  evaluating the second prong of the <u>Lemon</u> test is whether the
19  government's action *actually* conveys a message of endorsement or
20  disapproval of religion.  <u>Lynch v. Donnelly</u>, 465 U.S. 668, 690
21  (1984) (O'Connor, concurring) (emphasis added).  This
22  determination is made from the perspective of a "reasonable
23  observer" who is informed and familiar with the history of the
24  government's practice at issue.  <u>Brown</u>, 27 F.3d at 1378-79.  In
25  evaluating Establishment Clause challenges to elementary school
26  textbooks, the reasonable observer is an objective observer in
27  the position of an elementary school student.  <u>Id.</u>  Hence, a
28  reasonable observer in this case is the objective sixth grade

1   student.   Id.

2        In reviewing plaintiff's objections to the textbooks, the

3   court must consider the textbooks and the curriculum as a whole

4   to determine whether the primary effect is to endorse or inhibit

5   religion.   Grove, 753 F.2d at 1540 (Canby, concurring)

6   ("Objectivity in education need not inhere in each individual

7   item studied; if that were the requirement, precious little would

8   be left to read.").   Moreover, the court does not consider the

9   various expert opinions offered by both parties on this issue.

10  The United States Supreme Court generally has not relied on

11  expert testimony to determine whether a school practice

12  reasonably appears to endorse or inhibit religion.   See e.g.

13  Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1 (1993).

14  "Instead of engaging in a 'battle of the experts' in deciding

15  Establishment Clause cases, courts rely upon assumptions about a

16  'hypothetical observer' (in this case a hypothetical child) to

17  determine whether a government action conveys an endorsement [or

18  inhibition] of religion."   Brown, 27 F.3d at 1382 (internal

19  citations omitted).   Thus, in Brown the court recognized that

20  testimony of expert witnesses does not raise a genuine issue of

21  fact for trial where it is "of little use in determining whether

22  a practice is unconstitutional."   Id.   Accordingly, this court

23  has not relied on the various experts' opinions offered on this

24  issue by the parties.

25       To prevail on this element of the Lemon test, CAPEEM must

26  show that an objective sixth grade student would find that the

27  primary effect of the textbooks is to convey a message that the

28  government endorses Abrahamic religions or disapproves of

                                  51

Hinduism.  While the parties heavily dispute whether the adopted
textbooks neutrally and accurately depict these religions, that
dispute does not preclude entry of summary judgment in favor of
defendants.  Even considering the evidence in the light most
favorable to plaintiff (i.e., accepting plaintiff's position that
the texts, in part, inaccurately and negatively depict Hinduism
while simultaneously providing a more favorable depiction of
Abrahamic religions),[23] the court cannot find that the textbooks,
when viewed as a whole and as part of the overall curriculum,
convey a message of government endorsement or disapproval of a
particular religion.

Significantly, the challenged passages of the textbooks are
only a small portion of otherwise clearly nonreligious texts--the
books at issue are *history-social sciences* textbooks--which are
part of a clearly, nonreligious history-social sciences program.
In that respect, this case is closely analogous to <u>Brown</u> wherein
the Ninth Circuit recognized that when a challenged textbook is
only a small part of an otherwise clearly nonreligious program,
it is "unlikely that [an] objective observer would perceive the
inclusion of the [objected-to] selections . . . as an endorsement
or disapproval of religion."  27 F.3d at 1381 ("The fact that the
Challenged Selections constitute only a minute part of the
<u>Impressions</u> curriculum further ensures that an objective observer
in the position of an elementary school student would not view
them as religious rituals endorsing witchcraft.")

_____

[23]   <u>See</u> <u>Grove</u>, 753 F.2d at 1539 (Canby, concurring)
(assuming arguendo that the <u>Learning Tree</u> embodied anti-Christian
elements and finding that summary judgment was properly granted
in the defendant school district's favor).

1    The Ninth Circuit's decision in <u>Grove</u> is in accord, and

2    <u>Grove</u> is also factually analogous to this case.  In <u>Grove</u>, the

3    plaintiffs alleged that the book entitled <u>The Learning Tree</u>,

4    which was part of the defendant school's sophomore curriculum,

5    advanced the religion of secular humanism in violation of the

6    Establishment Clause.  The court rejected the claim.  Observing

7    that the Supreme Court has stated clearly that literary and

8    historic study of the Bible is not prohibited religious activity,

9    the court concluded the reading of the book was not a ritual but

10   a study of the "expectations and orientations of Black

11   Americans."  753 F.2d at 1534.  The court considered the book "in

12   the context of the whole curriculum" and concluded that it was

13   one book "included in a group of religiously neutral books in a

14   review of English literature, as a comment on an American

15   subculture."  <u>Id.</u>

16       Plaintiff's reliance, to the contrary, on <u>Vaughn</u> and <u>Herdahl</u>

17   is uncompelling.  These cases involved the teaching of *religious*

18   *education classes*, in <u>Herdahl</u>, more specifically, the Bible, by

19   private religious educators brought in to the public schools by

20   the school districts; the classes were taught during normal

21   school hours and on school grounds; students could "opt out" of

22   the religious education classes and perform other course work

23   during this class time.  <u>Vaughn</u>, 313 F. Supp. at 433-34;

24   <u>Herdahl</u>, 933 F. Supp. at 593-98.  As stated succinctly by the

25   <u>Herdahl</u> court, such overtly, religious classes are not presented

26   "objectively as part of a secular program of education" and thus,

27   clearly violate the Establishment Clause.  <u>Herdahl</u>, 933 F. Supp.

28   at 595 (noting that the testimony of the Bible teachers

themselves, the lessons plans, exams and Bible class materials all confirmed that the Bible classes offered at the schools advance religion in general and specifically, fundamentalist Christianity).

The same cannot be said of defendants' use of the subject history-social sciences textbooks in this case. Here, the study of religion, including Hinduism, is done in the context of the sixth grade world history and ancient civilizations course. (DUF ¶ 2.) More specifically, the study of religion is done within the larger context of human history. (DDF ¶s 156-168.) Students study the world history and geography of ancient civilizations, including the early societies of the near East and Africa, the ancient Hebrew civilization, Greece, Rome and the classical civilizations of India and China. (DDF ¶ 161.) Students receive an overview of these societies, including the geography of the region; trade; art; social, economic and political structures; and the everyday lives of the people. (DDF ¶ 162.) In this context, students study about the religions and religious texts of the different ancient civilizations. (DDF ¶s 163-168.) It is within this overall curriculum that plaintiff's specific objections to the texts must be evaluated.

And, within this context, the court cannot find that a reasonable sixth grade student using the in question texts would believe the primary effect of the books is to convey a message that the State approves of a particular religion or specifically disapproves of Hinduism. A few examples ably illustrate this point. For instance, CAPEEM objects to the OUP's portrayal of Hindu women (PDF ¶ 243), but the specific section it complains of

54

is a direct quote from a Hindu text, the Code of Manu (<u>Id.</u>).  The
OUP textbook goes on to sensitize the quote by explaining that
women were more independent than what the Code says, stating:
"The code claims that 'On account of offspring, a wife is the
bearer of many blessing, worthy of honor, and the light within a
home; indeed in a home no distinction at all exits between a wife
and Sri, the Goddess of Fortune." (Adams Supp. Decl, Ex. A at
141.)  Thus, when read in context, it is clear that the textbook
actually softens the portrayal of women's role from that found in
the ancient Hindu texts.  CAPEEM's objections to the caste system
are equally unavailing when read in context.  For example,
plaintiff objects that the textbook by McGraw Hill "passes a
judgment that the caste system was wrong as it was a system
created by Aryans for light-skinned people to oppress dark-
skinned people." (PDF ¶ 217.)  To the contrary, the subject
textbook actually provides that no one is sure why the caste
system was created, and it gives multiple possible reasons,
including: "[I]deas about skin color were probably part of it.
The Aryans were a light-skinned people.  They thought they were
better than the dark-skinned people they encountered in India.
This idea was wrong but the Aryans believed it." (Balasubramani
Decl., filed Jan. 13, 2009 [Docket #172], Ex. 87-1.)  Moreover,
the textbooks refer to the "Aryans" developing the caste system,
not Hindus.

     The State has an obligation to teach history, including its
"warts and bumps," as described by defendants. (Defs.' Reply at
15:19.)  Conveying accurate but what may well be perceived as
negative aspects of Hinduism does not mean that the primary

1    effect of the textbooks is to inhibit religion.  <u>See</u> <u>Grove</u>, 753
2    F.2d at 1540-41 (Canby, concurring) (noting that "Christianity's
3    negative portrayal in curriculum reading material does not
4    support a finding of government disapproval of Christianity).
5    CAPEEM argues here that the portrayals of Hinduism in a variety
6    of respects should be more positive because CAPEEM perceives the
7    current depictions as hostile to Hinduism.  (Pl.'s Opp'n to MSJ
8    at 26-30.)  However, courts have held that even government action
9    that has the effect of perceived hostility toward a religious
10   group does not violate the Establishment Clause so long as the
11   hostility is not the action's *primary* effect.  <u>Brown</u>, 27 F.3d at
12   1398-99.  CAPEEM has failed to show that the State's refusal to
13   accept the HEF/VF edits resulted in the adoption of textbooks
14   that an objective sixth grade student would find convey a message
15   of government disapproval of Hinduism.

16       CAPEEM's comparison of edits that were accepted or rejected
17   between different religious groups, allegedly demonstrating the
18   more favorable treatment of other Abrahamic religions, is equally
19   unavailing.  The appropriateness of the recommended edits for
20   each religion must be determined on a religion-by-religion basis
21   as each has its own tenets.  Furthermore, courts have repeatedly
22   recognized that "[t]otal separation of church and state is simply
23   impossible."  <u>Grove</u>, 753 F.2d at 1539 (Canby, concurring) (citing
24   <u>Lynch</u>, 104 S.Ct. at 1362).  The First Amendment is not violated
25   merely because particular governmental activity happens to
26   "coincide or harmonize with the tenets of some or all religions."
27   <u>Id.</u> (internal quotations and citations omitted).  Finally, the
28   Supreme Court has warned that courts should not be in the

position of analyzing the minutia of textbook edits and
curriculum decisions.  As set forth above, in <u>Abington Sch.</u>
<u>Dist.</u>, the Court specifically recognized that teaching many
social sciences requires mentioning religions, but ultimately
decisions about how religion is taught:

> are matters which the courts ought to entrust very
> largely to the experienced officials who superintend
> our Nation's public schools.  They are experts in such
> matters, and [the courts] are not.

374 U.S. at 300 (Brennan, J., concurring).  Indeed, plaintiff
fails to cite even one analogous case wherein a court struck down
a school's use of a particular book on Establishment Clause
grounds.  And, controlling case law from this circuit plainly
supports defendants' position that their adoption of the subject
textbooks did not violate the Establishment Clause.  For the
reasons set forth above, <u>Brown</u> and <u>Grove</u> are factually analogous
cases which largely control the resolution of this issue.

   In sum, CAPEEM's isolated passages taken out of context do
not support its Establishment Clause claim.  When the textbooks
are read as a whole, and as part of the larger curriculum, it is
clear that the primary effect of the textbooks is to educate
students about ancient history, and not to serve as a religious
primer.  <u>See</u> <u>Grove</u>, 753 F.2d at 1540.  The textbooks are history
books.[24]  An objective sixth grade student would find that the

---

[24]   Indeed, in analyzing the same essential challenges to
the textbooks under state law, a state superior court determined
that the subject books are neutral and non-discriminatory.  "The
various texts appear to the Court on their face to be
dispassionate and neutral with respect to religion, objectively
describing the features of the Hindu religion and others without
overtly or covertly 'taking sides' with one another.  Moreover,
the Court finds nothing in the way of derogatory language or
(continued...)

57

primary effect of the textbooks is education about world history, rather than promoting or inhibiting religions.  Because CAPEEM cannot meet its burden of proving otherwise, its challenge to the textbooks' contents fails the second prong of the Lemon test.

### (3)   Excessive Entanglement with Religion

The third prong of the Lemon test prohibits excessive entanglement with religion.  The Ninth Circuit recognized in Brown that the mere adoption and use of curriculum materials is insufficient to constitute excessive entanglement.  27 F.3d at 1383-84.  Here, other than objecting to defendants' adoption of the subject textbooks, plaintiff points to no other conduct by defendants which could support a finding of an excessive entanglement with religion.  Again, for the reasons set forth above, the subject textbooks are history books which contain some discussion of religion.  Plaintiff has not demonstrated how that limited discussion endorses or inhibits any particular religion or creates an excessive entanglement with religion.

In its only argument opposing defendants' motion on this issue, plaintiff cites out-of-circuit authority holding that unlawful entanglement can be shown where the government is placed in a position of choosing among "competing religious views." EEOC v. Catholic Univ. of Am., 317 U.S. App. D.C. 343 (D.C. Cir. 1996); Rweyemamu v. Cote, 520 F.3d 198, 208 (2nd Cir. 2008). Plaintiff contends it has proffered evidence of defendants' decisions choosing among competing religious beliefs.  For

_____

[24](...continued)
examples from sacred texts or other religious literature that could be classified as derogatory, accusatory or that would instill prejudice against the Hindu religion or its faithful. (Defs.' RJN, Ex. A at A0010.)

example, plaintiff contends that during the textbook adoption
process, defendants adjudicated between competing visions of the
significance of the crucifiction of Jesus. (PDF ¶ 88.) Even if
these cases were binding on this court, they would not support a
finding of excessive entanglement in this case.

These decisions do not address a State's adoption of secular
curriculum materials and as such, are inapposite. <u>Catholic Univ.
of Am.</u>, 317 U.S. App. D.C. at 353 (dismissing a Catholic nun's
Title VII sex discrimination suit against the University because
the controversy over the nun's qualifications for tenure placed
the court in the impermissible position of having to evaluate
competing opinions on religious subjects, which the Establishment
Clause does not permit); <u>accord</u> <u>Rweyemamu</u>, 520 F.3d at 208
(dismissing African American Catholic priest's Title VII race
discrimination suit against Bishop and Diocese wherein he alleged
that the Roman Catholic Diocese misapplied canon law in denying
him a promotion to parish administrator). These cases involve
the so-called "ministerial exception" under which courts have
declined to interfere with ecclesiastical hierarchies, church
administration, and appointment of clergy, recognizing that to
take sides in a religious dispute would lead an Article III court
into excessive entanglement in violation of the Establishment
Clause. Clearly, the "ministerial exception" has no
applicability to this case.

To the contrary, the Ninth Circuit held in <u>Brown</u>, a case
challenging a school district's use of a particular reading
series allegedly endorsing religious rituals of witchcraft, that
the mere adoption and use of curriculum materials does not

1  establish excessive entanglement for purposes of the <u>Lemon</u> test.
2  27 F.3d at 1383 (recognizing that the School District's use of
3  the reading series was "not an intentional effort to aid overtly
4  religious exercises and issues").  The same is true here.
5  Plaintiff has failed to establish that defendants' use of the
6  subject textbooks foster an excessive entanglement with religion,
7  and thus, summary judgment is properly entered in defendants'
8  favor.  Plaintiff cannot show that any of the three prongs of the
9  <u>Lemon</u> test has been breached in this case.

10      The court therefore GRANTS defendants' motion as to
11  plaintiff's Establishment Clause claim based on defendants'
12  adoption and use of the subject sixth-grade history-social
13  sciences textbooks.

14          **d.   Free Speech and Association Clause Claim**

15      Defendants move for summary judgment as to plaintiff's third
16  claim for relief for violation of the First Amendment's Free
17  Speech and Association Clauses on the ground plaintiff cannot
18  establish a violation of their members' free speech or
19  association rights because CAPEEM has no right to dictate the
20  content of the government's speech in this case, and defendants
21  can impose reasonable time, place and manner restrictions on
22  plaintiff's members' speech conducted in limited public fora.
23  (Defs.' Mem. of P. & A. in Supp. of MSJ, filed Dec. 30, 2008
24  [Docket #157], at 32-35.]  Defendants' arguments misconstrue the
25  nature of this claim.  As alleged in the second amended
26  complaint, CAPEEM contends defendants improperly penalized CAPEEM
27  members (and others who supported the HEF/VF edits) for their
28  supposed affiliation with third party "Hindutva" groups.

1  Plaintiff asserts that in rejecting the HEF/VF edits solely

2  because defendants believed CAPEEM members and other Hindu groups

3  were affiliated with certain third-party "Hindu nationalists"

4  groups, defendants chilled the First Amendment free speech and

5  association rights of CAPEEM's members.  (SAC ¶s 7.1-7.9.)

6        This is plaintiff's theory as alleged in its complaint.

7  Now, at summary judgment, plaintiff must proffer evidence in

8  support of that theory.  In attempting to establish the existence

9  of a factual dispute, the opposing party may not simply rely upon

10 its pleading, but is required to tender evidence of specific

11 facts in the form of affidavits, and/or admissible discovery

12 material, to support its contention that a factual dispute

13 exists.  Fed. R. Civ. P. 56(e).  Plaintiff has not done so here.

14 In its opposition, plaintiff cites only the deposition testimony

15 of CAPEEM member Karthik Venkataramni in support of this claim.

16 (Pls.' Opp'n to Defs.' MSJ at 33-34.)  Mr. Venkataramni testified

17 that his wife was concerned over him being demonized for his

18 participation in the textbook adoption process, and she wondered

19 whether his participation in the process would inhibit other

20 civil rights activities he might choose to engage in the future.

21 (PDF ¶ 169.)

22       Said testimony is insufficient to raise a triable issue of

23 fact as to whether defendants' conduct chilled CAPEEM's members

24 free speech and association rights.  First, the testimony is

25 inadmissible hearsay and not properly considered by the court in

26 the first instance.  Fed. R. Evid. 801.  Even were the court to

27 consider the evidence, the testimony does not establish that Mr.

28 Venkataramani was "demonized" due to any affiliation with

Hindutva or Hindu nationalist groups, nor does it establish that due to defendants' conduct, allegedly affiliating him with such groups, Mr. Venkataramani refrained from engaging in certain speech or association.  This testimony is simply irrelevant to this claim.

Because plaintiff offers no evidence whatsoever in support of its mere allegations that its members' free speech and association rights were chilled as a result of defendants' alleged actions affiliating CAPEEM's members with Hindu extremist groups, the court must grant judgment in defendants' favor on this claim.  While defendants did not move for summary judgment on this precise ground, they did move for judgment in their favor on this claim.  As the moving party, who does not bear the burden of proof at trial on this claim, defendants needed to show only "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325.  In their reply, defendants point out, correctly, that plaintiff's opposition relies on "mere allegations and denials" which are insufficient to meet its burden on summary judgment.  Id.; (Defs' Reply at 18.) Without admissible evidence to support its claim, plaintiff cannot withstand summary judgment.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for partial summary judgment as to its equal protection claim asserted on the basis of the alleged unlawful indoctrination of students into the Christian and Jewish religions is DENIED; plaintiff lacks standing to raise such a claim which is not germane to its organizational purpose.  Defendants' motion for summary judgment,

1    or alternatively, partial summary judgment is GRANTED in part and

2    DENIED in part.  Judgment is entered in defendants' favor as to

3    plaintiff's Establishment and Free Speech and Association Clause

4    claims.  Defendants' motion is DENIED with respect to plaintiff's

5    equal protection claim to the extent it alleges violations of law

6    based on conduct occurring during the textbook adoption process;

7    defendants' motion as to plaintiff's equal protection claim is

8    GRANTED, however, to the extent this claim is based on the

9    subject textbooks' content; such a claim is not cognizable under

10   the Equal Protection Clause.

11        IT IS SO ORDERED.

12   DATED: February 25, 2009

15        FRANK C. DAMRELL, JR.
          UNITED STATES DISTRICT JUDGE